**In the Matter of: K.S.H., by Next Friend M.S.H., and M.S.H., individually, Plaintiffs/Respondents,**

**v.**

**C.K., Defendant/Appellant,**

**and**

**R.W.H., Intervenor/Respondent.**

**No. SD 31297.**

Missouri Court of Appeals, Southern District, Division Two.

Dec. 15, 2011.

---

James R. Sharp, Springfield, MO, for Appellant.

Mark Millsap, of Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Presiding Judge.

C.K. ("Mother") appeals the "Judgment of Paternity, Child Custody and Support" awarding sole legal custody of her daughter, K.S.H., to third-party intervenor, R.W.H. ("Grandmother"). We affirm the judgment of the trial court.[1]

### Factual and Procedural History

K.S.H. was born in 2001 to Mother and M.S.H. ("Father"). On March 2, 2009,

---

1. This case was assigned for trial before the Honorable Scott Tinsley, a commissioner of the Family Court division of the circuit court. The judgment, which adopted Commissioner Tinsley's recommended findings and judgment, was executed by associate circuit judge Mark A. Powell on March 7, 2011. Commissioner Tinsley and Judge Powell will be referred to collectively as "the trial court."

Father filed a "Petition for Determination of Father–Child Relationship, Order of Child Custody and Order of Child Support." After Mother filed her answer to Father's petition and a "Counter–Petition for Declaration of Father–Child Relationship, for Order of Support, and Order of Custody," the trial court entered an interlocutory judgment finding Father to be K.S.H.'s biological father and granted Father "all legal rights associated therewith[.]"

On February 16, 2010, Grandmother— the paternal grandmother of K.S.H.—filed her "Motion for Leave of Court to Intervene as Third–Party Petitioner for Purposes of Seeking Custody of Minor Child." A bench trial was held on January 18, 2011 and February 9, 2011. The following evidence was adduced at trial and is recited consistent with our standard of review—in the light most favorable to the judgment. *See In re R.A.D. ex rel. T.L.D.*, 348 S.W.3d 778, 780 (Mo.App. S.D.2011).

Since K.S.H.'s birth, Mother has lived in six different places but since November 2008, she has lived in the same place with her boyfriend, D.W. In addition to K.S.H., Mother's daughter with D.W., and another son, also lived with them. Mother has one other son who lives with his father. K.S.H. has a strong relationship with her siblings, with D.W., and with her maternal grandmother.

Father has not had a strong relationship with K.S.H., only asking for contact when K.S.H. was six or seven years old; he did not ask for custody during the bench trial.[2] Grandmother first became involved in K.S.H.'s life when K.S.H. was seven years old.

In June 2008, the Nixa Police Department contacted Mother regarding an incident where K.S.H. and her brother were the subjects of a Christian County Children's Services investigation—the two children were not properly supervised by an adult. Mother had left K.S.H. and her younger son in the maternal grandmother's care while Mother went to work. The three-year-old son was observed running down the street with no adult present. K.S.H. and another young girl were at the same time observed riding their bikes along the same street.

In November 2008, Mother was arrested and charged with driving while intoxicated, pled guilty, and lost her driver's license for one year. In 2004, Mother was also charged with, and convicted of, a crime in conjunction with her assault of a Springfield police officer.

In February 2009, after K.S.H. would not stay in bed, Mother spanked her with a plastic clothes hanger, leaving bruises and marks on K.S.H.'s arms. On February 4, 2009, a school nurse noticed the bruises and red welts on K.S.H.'s arms and made a hotline call to the Division of Family Services.

In April 2009, Mother took K.S.H. to a dentist for an abscessed tooth. Subsequently, a disagreement between Mother and Grandmother ensued concerning the treatment or lack of treatment of K.S.H.'s dental care. Thereafter, Mother requested K.S.H.'s dental records from the dentist because she would be taking K.S.H. to a different dentist. K.S.H. did not see another dentist until June 17, 2010. On that date, K.S.H. was diagnosed with six cavities. Despite complaints from K.S.H. that her teeth were hurting, and disregarding attempts by Grandmother to convince

---

**2.** Father was physically present at trial, *pro se*, but presented no evidence, nor did he testify.

Mother of the need to take K.S.H. back to the dentist, Mother did not schedule a follow-up dental appointment for K.S.H. to take care of the six cavities until December 28, 2010. At least one of the six cavities was quite large, black, and clearly visible to the naked eye. Classmates teased K.S.H. about her teeth after they saw the large black cavity. Grandmother had repeatedly asked Mother to allow her to take K.S.H. back to the first dentist, at her own expense, to take care of the cavities. However, Mother would not agree, resulting in the filing of a "Motion for Dental Care for Minor Child" by the guardian ad litem ("GAL") to permit Grandmother to take K.S.H. back to the dentist. The motion court sustained that motion to ensure K.S.H.'s dental care needs would be promptly served. Mother admitted that K.S.H.'s tooth could have, and should have, been fixed long before it was, and that she had control over the tooth's treatment.

The GAL testified that when she visited Mother's home, she observed Mother's son alone in the house in a playpen while Mother was mowing the lawn. There were pieces of dog food stuck to the child's diaper and in the playpen. In K.S.H.'s room, the GAL observed adult clothing everywhere, but no children's clothing was readily apparent. There was nothing in the room at that time to indicate it was a child's room—no toys, nothing on the walls.

The GAL explained K.S.H. made it clear she wanted to live with her Mother. K.S.H. told the GAL on numerous occasions she wanted to be with her Mother without any questioning from the GAL on that issue. The GAL also noted that K.S.H. did well in school despite the chaos in her life, but she had deep concerns about K.S.H.'s ability to form attachments and ability to function "under the weight of

the responsibility that's been placed on [K.S.H.]."

The GAL testified that the future for K.S.H. was "so at risk" that she did not believe it was appropriate for Mother to have custody of K.S.H., and that the best interest of K.S.H. required that Grandmother have custody. The GAL was especially concerned about Mother's attempts to destroy the relationship between K.S.H. and Grandmother. There was also no evidence of K.S.H. playing with friends or having friends to her house. However, the GAL noted that K.S.H. loved her mother and it was important for K.S.H. to have a relationship with Mother.

K.S.H. began seeing Tammy Boggess ("Boggess"), a licensed clinical social worker, on October 8, 2010. Boggess described K.S.H. as a "vivacious kind of girl . . . very engaging . . . who likes to talk." Boggess testified that there were problems with scheduling K.S.H. for her appointments. On the first visit, Mother dropped K.S.H. off and asked if she could run some errands. Mother was told that the session would end at "20 after the hour," but Mother did not return until thirty-five minutes after the session was over. K.S.H. became sad, upset and tearful and asked to call her Mother to see where she was. Thereafter, Boggess and her office manager had a difficult time scheduling appointments with Mother and only saw K.S.H. once in October, once in November, and twice in December. A court order was then entered whereby Grandmother brought K.S.H. to therapy. Visits were fairly consistent thereafter with K.S.H. being on time as scheduled for her weekly visits.

Boggess testified that when the sessions began, K.S.H. was excited and would readily talk, even in sessions with Grandmother. However, that changed quickly, in Boggess' opinion, when K.S.H. became

privy to the conflict between Mother and Grandmother. K.S.H. then began having doubts regarding Grandmother. K.S.H. shared with Boggess her belief that Grandmother was lying to her. Boggess testified things continued to get worse and at the time of the conflict with K.S.H.'s dental treatment, K.S.H. told Boggess her Grandmother was giving her candy to try to cause cavities "to prove—to show evidence that [Mother] was not taking good care of her." Boggess testified that developmentally speaking, this was beyond a nine-year-old's capacity to connect the giving of candy to cause cavities as "proof" and "evidence" to be used against Mother in court. K.S.H. also shared with Boggess her Mother's belief that Grandmother was trying to remove K.S.H. from her Mother's care, that K.S.H. would not get to see her Mother again, and that Grandmother would move away and take K.S.H. with her. K.S.H. later told Boggess she had come up with these ideas on her own. However, K.S.H. was very aware of the conflict and referred to the parties involved as "teams." K.S.H. would make comments about being on Grandmother's side, or on someone's team, and expressed concern she would have to decide or make a choice of whose side or team she was on. There was no indication that Grandmother was discussing the legal issues with K.S.H.

Boggess testified K.S.H. expressed concern about her lack of friends at school, she felt lonely, and that it was because "they are all liars." K.S.H. told Boggess she would love to have someone spend the night, but her Mother would not allow it. K.S.H. never had the opportunity to sleep over at anyone's house other than family. K.S.H. also had concerns regarding lack of clothing at her Mother's house as her Mother would forget to do laundry. Most of her clothing was at her maternal grandmother's house. K.S.H. indicated she did not have many toys at her Mother's house

and played a lot with her younger brother's toys. She would play on the computer mostly at Mother's house. As to Christmas presents, she indicated Christmas 2010, she only got a lipstick and eye shadow from Mother, but that her younger brother got "like nine presents and more from Santa." She did receive presents from both grandmothers and other family members.

Boggess also testified K.S.H. never initiated or indicated she wanted to go over to Boggess' office play area, which is highly unusual for a nine-year-old girl. Boggess stated this was of some concern as it might "indicate some attachment issues, some ability to kind of free herself up as a child and explore, do the natural exploration." Boggess testified that K.S.H. was despondent during the summer as she was not home with Mother, and loved the school year best as "she knows where she is going to be." During the summer, K.S.H. indicated she was "everywhere" with "everyone" and missed time with her Mother, D.W., and brother. Ms. Boggess also testified that Mother's lack of interaction with K.S.H. on a day-to-day basis was indicative or suggestive of a dismissive or avoidant parent disorder, manifested in a parent who is not in tune with or interacting with a child to the extent that the needs of the child are unmet. Boggess noted that children who are raised by a parent with this disorder may develop depression, poor social skills, and serious behavior issues.

Boggess testified that if K.S.H. remained in Mother's custody, that K.S.H.'s issues "would become bigger and more intense and ... create more problems within her daily life and lead her into adulthood without the healthy skills, to deal with things and unhealthy ways of interacting with people."

On March 7, 2011, the trial court entered its "Findings and Recommendations for Judgment of Paternity, Child Custody and Support." The trial court found that Father declined to fulfill his role in K.S.H.'s life and that custodial placement with him was not a viable option.[3] While the trial court found the testimony of Boggess and Grandmother had substantial credibility, the trial court noted Mother's testimony was generally lacking in credibility. The trial court also determined that Mother failed to provide K.S.H. with a stable, secure and emotionally healthy home environment. The trial court concluded Mother neglected and refused to seek appropriate dental care for K.S.H. between April 2009 and June 2010. The trial court also found that Mother did not appear to be emotionally available to K.S.H., that K.S.H.'s bond to Mother was not secure or healthy, and that Mother's lack of interaction with K.S.H. was indicative of dismissive or avoidant parent disorder. The trial court further determined that Mother had committed "emotional manipulation" of K.S.H., and that K.S.H. had been "victimized with the talk of 'teams' and 'winning' to try to destroy [K.S.H.]'s relationship with her Grandmother."

The trial court found that Grandmother was a stable, loving influence for K.S.H., and there was no indication that she had manipulated K.S.H. emotionally or that she had discussed this proceeding with K.S.H. The trial court concluded that Grandmother should have sole legal custody as the evidence "clearly demonstrated" that Mother and Grandmother could not work together as mutual decision makers on behalf of K.S.H. The trial court awarded sole legal and physical custody of K.S.H. to Grandmother, pursuant to a parenting schedule proposed by the GAL, and did not order any payment of child support.

This appeal followed. Mother alleges the trial court's statutorily required findings as set forth in section 452.375.5[4] are insufficient and that there was not substantial evidence to support a finding that Mother was unfit, unwilling or unable to be a proper custodian to K.S.H. or that there were any special or extraordinary circumstances in which the welfare of K.S.H. required that her custody be given to Grandmother. In this appeal, we determine whether or not there was sufficient evidence to rebut the presumption that parental custody is in a minor child's best interest.

## Standard of Review

This Court will affirm a trial court's award of child custody unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re R.A.D.*, 348 S.W.3d at 780. In reviewing the judgment of the trial court, we defer to the trial court's credibility determinations and view the evidence and reasonable inferences drawn therefrom in the light most favorable to the judgment. *Id.* Furthermore, the trial court is given broad discretion in child custody matters, and its decision will be upheld unless we are firmly convinced the welfare and best interest of the child requires otherwise. *Id.*

## Analysis

First, Mother argues the trial court erred in awarding custody of K.S.H. to

---

**3.** Father did not appeal the trial court's decision and is not a party to this appeal.

**4.** All references to section 452.375 are to RSMo Cum.Supp.2005, unless otherwise indicated. All rule references are to Missouri Court Rules (2011).

Grandmother in that the trial court failed to make specific findings, pursuant to section 452.375.5, that Mother was unfit, unsuitable or unable to have custody of K.S.H.; and did not make findings as to what specific or extraordinary circumstances required awarding custody of K.S.H. to Grandmother to protect her welfare. Mother, however, did not raise such allegations of error in her post-trial motion. "Pursuant to Rule 78.07(c), allegations of error relating to a failure to make required findings in a court-tried case are not preserved for appeal and are thereby waived unless raised in a post-trial motion to amend the judgment." *Crow v. Crow,* 300 S.W.3d 561, 565 (Mo.App. E.D.2009). Because the issue is unpreserved, we do not address Mother's argument relating to insufficient findings by the trial court.

■ Mother next contends the trial court erred in awarding custody to Grandmother because the judgment was not based on substantial evidence to support a finding that Mother was unfit, unwilling or unable to be a proper custodian to K.S.H., or that there were any special or extraordinary circumstances in which the welfare of K.S.H. required her custody be given to Grandmother in accordance with section 452.375.5(5)(a). We disagree.

■ "We presume parental custody is in a minor child's best interests." *Young v. Young,* 14 S.W.3d 261, 264 (Mo.App. W.D. 2000). We emphasize that this presumption does not put non-parents on equal footing with parents in terms of a custody issue. Rebutting this presumption requires that the third party seeking custody carry the burden of showing either that each parent is unfit, unsuitable, or unable to have custody, or that the welfare of the child requires third-party custody. *L.T.C. ex rel. Collins v. Reed,* 168 S.W.3d 142, 146 (Mo.App. S.D.2005); § 452.375.5(5)(a). "We have interpreted 'welfare of the child' to mean that a special, or extraordinary, reason or circumstance can make third-party custody in the child's best interests." *Young,* 14 S.W.3d at 264.

Here, the trial court found that the welfare of K.S.H. required, and it was in her best interest, that Grandmother be awarded custody.[5] The special circumstances noted by the trial court included the fact that Mother "ha[d] failed to provide [K.S.H.] with a stable, secure and emotionally healthy home environment[ ]"; K.S.H.'s "home life was very chaotic"; and that Mother had subjected K.S.H. to emotional manipulation. While we agree with Mother that some of the specific evidence cited in the judgment (e.g., Mother's "informal" parenting agreement with the father of her other children) is in fact irrelevant to the finding that the welfare necessitates K.S.H.'s placement with Grandmother, a review of the record reveals other substantial evidence that does support the trial court's conclusion that the welfare of K.S.H. required her placement with Grandmother.

As outlined above, there was evidence of physical abuse, emotional abuse, a chaotic home environment, neglect of health needs, the lack of a healthy parent-child relationship, emotional manipulation, and consistent poor judgment by Mother. Under these circumstances, we cannot say that the trial court was wrong in finding the welfare of K.S.H. required an award of third-party custody to Grandmother. The totality of these circumstances would, in our view, constitute extraordinary circumstances sufficient to allow the trial court to

---

5. The trial court's opinion specifically indicated such a finding by italicizing that part of section 452.375.5(5)(a) in the judgment. We note Mother does not allege any error with the trial court's best-interest findings.

find that Grandmother had rebutted the parental presumption in favor of Mother on the "welfare basis," for an award of third-party custody. Point denied.

The judgment of the trial court is affirmed.

BARNEY and BATES, JJ., concur.